IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DUANE V. SHOTTENKIRK,

Plaintiff,

v.

DR. MARK PATTON *et al.*,

Defendants.

Case No. 2:20-cv-00188-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Duane Shottenkirk ("Shottenkirk"), a self-represented litigant in custody at the Two Rivers Correctional Institution ("TRCI") of the Oregon Department of Corrections ("ODOC"), filed this civil rights action against Dr. Mark Patton ("Dr. Patton"), TRCI food service manager (first name unknown) Vester ("Vester"), ODOC dieticians Elena Guevara ("Guevara") and Betty Hansen ("Hansen") (together, the "ODOC Defendants"), and nurse practitioner Beata Sims ("Sims"). Shottenkirk alleges that Defendants acted with deliberate indifference to his serious medical needs by discontinuing his medically prescribed diet.

///

///

PAGE 1 – OPINION AND ORDER

Now before the Court is Shottenkirk's motion for leave to supplement his complaint (ECF No. 41),[1] Sims's motion for summary judgment (ECF No. 27), Shottenkirk's cross-motion for summary judgment against Sims (ECF No. 31), and the ODOC Defendants' motion for summary judgment (ECF No. 32). For the reasons that follow, the Court denies Shottenkirk's motion to supplement his complaint, grants the ODOC Defendants' motion for summary judgment, grants Sims's motion for summary judgment, and denies Shottenkirk's cross-motion for summary judgment.

**BACKGROUND**[2]

Shottenkirk is an adult in custody ("AIC") and is currently housed at TRCI. Shottenkirk was diagnosed with stage four prostate cancer and received radiation therapy, which permanently damaged his gastrointestinal ("GI") tract. (*See* Sec. Am. Compl. ("SAC") at 12.) In February 2019, Shottenkirk's oncologist prescribed him a soft bland diet to avoid a GI rupture. (*Id.*) In August 2019, Shottenkirk filed three separate grievances complaining that he was not receiving his prescribed diet and requesting reinstatement of a soft bland diet. (Decl. of Arnell Eynon ("Eynon Decl.") Att. 5, at 4; Att. 6, at 4; Att. 7, at 2.) On September 5, 2019, ODOC responded to Shottenkirk's grievances, acknowledging that Shottenkirk was "somehow removed from [his] [d]iet," and stating that TRCI medical staff had reinstated his soft bland diet. (*Id.* Att. 5, at 3; Att. 6, at 3.)

///

---

[1] The Court interprets Shottenkirk's "Complaint Addendum and Clarification" (ECF No. 41) as a motion for leave to supplement his complaint. (*See* Pl.'s Mot. Suppl. Compl. ("Pl.'s Mot.") at 1, "This is a supplement to the original complaint, not a replacement.")

[2] Unless otherwise noted, the following facts are either undisputed or presented in the light most favorable to Shottenkirk.

On September 6, 2019, Shottenkirk filed another grievance requesting that his soft bland diet be reinstated. (*Id.* Att. 8, at 2.) On October 9, 2019, ODOC responded to Shottenkirk's grievance and provided the following timeline of TRCI medical staff's actions: (1) "on August 28, 2019, Dr. Patton changed your order to a soft diet"; (2) "[o]n September 3, 2019, a new order was written for a bland low residual diet"; and (3) on "September 10, 2019, Dr. Patton re-ordered your diet as soft low residual bland diet including health snacks" for one year. (*Id.* Att. 8, at 1.) The grievance coordinator concluded that TRCI medical staff "met the demands of this grievance." (*Id.*)

On September 17, 2019, Shottenkirk appealed his first two grievances. ODOC responded that "[y]ou are currently on a Low Residue soft diet with a snack" and "Food Services has been instructed to follow the low residue diet because it is comparable to the diet your oncologist wanted you to follow." (*Id.* Att. 6, at 1; Att. 5, at 1.) On October 10, 2019, before Shottenkirk received the response to his September 6 grievance, Shottenkirk filed another grievance complaining that the low residue diet "isn't working" and again requesting his prescribed diet. (*Id.* Att. 9, at 2.)

In April 2020, Sims started working at TRCI as a nurse practitioner. (Decl. of Beata Sims ("Sims Decl.") ¶ 2.) Sometime in April, Sims removed Shottenkirk from his low residue diet and placed him on a regular diet. (*Id.* ¶ 3.) Shottenkirk alleges that Sims took him off his diet because "she wanted me to have more vegetables." (SAC at 12.) Sims alleges she changed Shottenkirk's diet to "accommodate more meal choices" in response to his requests for specific food items. (Sims Decl. ¶ 3.)

On April 20, 2020, Shottenkirk sent a kyte to Sims requesting that she reinstate his soft bland diet, stating "since I've been off my diet, I'm throwing up, my stomach is all upset, and I

have diarea [sic] again." (Decl. of Scott G. O'Donnell ("O'Donnell Decl.") Ex. 2.) On April 24,

2020, Sims responded to Shottenkirk's kyte, explaining that the "low-residue diet also functions

as [a] bland diet[,]" and that Shottenkirk's medically prescribed diet "includes many of the diet

food items included in [O]DOC's low-residue special diet." (Id. Ex. 3.) Sims attached copies of

Shottenkirk's medically prescribed diet and ODOC's low residue diet to demonstrate the

similarities between the diets, explained that she changed Shottenkirk's diet so that he "may

specifically design/choose food items from the regular diet," and suggested that he purchase any

additional items not on the low residue diet from the canteen at the prison. (Id.; Sims Decl. ¶ 4.)

On October 9, 2020, Shottenkirk filed a second amended complaint, alleging that the

defendants were deliberately indifferent to his serious medical needs by prematurely

discontinuing his prescribed medical diet. (SAC at 12.) Shottenkirk seeks "[r]einstatement of my

bland soft diet," "an order barring Defendants from stopping or changing my diet again," and $1

million for "pain and suffering" and $100,000 in damages from each defendant. (Id. at 5.)

On July 16, 2021, after the parties had fully briefed their cross-motions for summary

judgment, Shottenkirk filed a motion for leave to supplement his complaint to add a retaliation

claim. (ECF No. 41.)

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Rule 15(d)

Pursuant to Federal Rule of Civil Procedure 15(d), the court may permit a plaintiff to

supplement his complaint in order to include "any transaction, occurrence, or event that

happened after the date of the pleading to be supplemented." FED. R. CIV. P. 15(d). "Rule 15(d)

permits the filing of a supplemental pleading which introduces a cause of action not alleged in

the original complaint and not in existence when the original complaint was filed." *Cabrera v.*

*City of Huntington Park*, 159 F.3d 374, 382 (9th Cir. 1998) (internal quotations omitted). "The purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible by allowing the addition of claims which arise after the initial pleadings are filed." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1057 (9th Cir. 1982). The district court has "broad discretion" in deciding a Rule 15(d) motion. *See Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988).

"The factors relevant to a Rule 15(a) motion to amend are considered when addressing a motion to supplement under Rule 15(d)." *Singh v. Washburn*, No. 2:14-cv-01477-SB, 2016 WL 1039705, at *9 (D. Or. Feb. 5, 2016). "Those factors include: (1) undue delay, (2) bad faith, (3) repeated failure to cure deficiencies, (4) undue prejudice, and (5) futility of the amendment." *Barrett v. Williams*, No. 6:11-cv-06358, 2013 WL 6055247, at *2 (D. Or. Nov. 14, 2013) (citation omitted); *see also Keith*, 858 F.2d at 475 (holding that a court may deny leave to supplement a complaint on grounds of undue delay, prejudice to the opposing party, or futility).

### B. Summary Judgment

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## II.    ANALYSIS

### A.    Supplemental Complaint

Shottenkirk seeks leave to supplement his complaint to add a retaliation claim against TRCI medical staff. (Pl.'s Mot. at 3.) The retaliation claim arises from TRCI medical staff's alleged cessation of Shottenkirk's hormone suppression medication to treat his Stage IV metastatic prostate cancer. (*Id.* at 3-4.) Shottenkirk alleges that unnamed TRCI medical personnel stopped providing him with his hormone suppression medication for over a month until the Therapeutic Level of Care Committee restarted the medication. (*Id.* at 4.)

"While leave to permit supplemental pleadings is favored, it cannot be used to introduce a separate, distinct and new cause of action." *Planned Parenthood of S. Ariz. v. Neely*, 130 F.3d 400, 402 (9th Cir. 2002) (simplified). Shottenkirk's retaliation claim against TRCI medical staff is separate and distinct from the claims about his diet in the operative complaint. The retaliation claim relates to conduct that occurred between one to two years after the incidents upon which Shottenkirk's diet claims are based. (*Compare* Pl.'s Mot. at 4, alleging TRCI medical staff retaliated against him in June 2021, *with* SAC at 5, *and* Pl.'s Mot. Summ. J. at 6, alleging that the defendants' conduct between August 2019 to April 2020 constituted deliberate indifference to Shottenkirk's serious medical needs.) In addition, Shottenkirk's proposed supplemental complaint does not plead any claims against the currently named defendants in this case. *See Singh*, 2016 WL 1039705, at *10 (noting that "Singh's supplemental complaint does not include new toxic mold and inadequate medical care claims against the currently named defendants in this case" and therefore his proposed supplemental complaint is not a "'discrete and logical extension of the original claim' against the already named defendants" (quoting *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior*, 236 F.R.D. 491, 501 (E.D. Cal. 2006))); *Underwood v. Nooth*, No. 2:16-cv-01321-PK, 2017 WL 8785575, at *3 (D. Or. Dec. 11, 2017)

("In his Third Amended Complaint, Plaintiff named Defendant Rossi and alleged she interfered

with his law library access. Plaintiff now seeks to add a claim alleging that, in response to

Plaintiff's complaint against her, Defendant Rossi subsequently retaliated against him. A new

claim of retaliation against Defendant Rossi is separate and distinct from the other claims."); *see

also Neely*, 130 F.3d at 402 (stating that Rule 15(d) "cannot be used to introduce a separate,

distinct and new cause of action").

　　　　Allowing Shottenkirk to supplement his complaint to allege a new, distinct claim runs

counter to the interests of judicial economy. *See Underwood*, 2017 WL 8785575, at *2 ("Courts

are reluctant to grant motions to amend after the parties have finished discovery and filed

summary judgment motions."); *Contreraz v. Stockbridge*, No. 1:06-cv-01817-LJO-SKO PC,

2012 WL 396503, at *1 (E.D. Cal. Feb. 7, 2012) (denying the AIC's request to file a

supplemental complaint on grounds that doing so "[w]ould not serve the interests of judicial

economy and convenience, and the proposed claims are simply not sufficiently related to the

present claim to support allowing leave to supplement"). This case has been pending since

February 3, 2020, and the parties have filed cross-motions for summary judgment. Allowing

Shottenkirk to plead a new claim would require additional discovery and additional extensions of

time. *See Singh*, 2016 WL 1039705, at *10 ("The supplemental complaint would significantly

widen the scope of this litigation, as the new claims will require different witnesses and evidence

to establish a prima facie case."); *Schlacter-Jones v. Gen. Tel. of Cal.*, 936 F.2d 435, 443 (9th

Cir. 1991) ("The timing of the motion, after the parties had conducted discovery and a pending

summary judgment motion had been fully briefed, weighs heavily against allowing leave [to

amend.]"), *overruled on other grounds by Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683

(9th Cir. 2001). As a result, the current defendants would be prejudiced by the increased scope,

cost, and length of this litigation. *See, e.g.*, *Candler v. Santa Rita Cnty. Jail Watch Commander*, No. C-11-1992-CW (PR), 2013 WL 5568248, at \*2 (N.D. Cal. Oct. 9, 2013) ("Because the events in the proposed supplemental pleading occurred more than two years after the events alleged in Plaintiff's amended complaint, responding to them at this time would cause undue prejudice to Defendants.").

For these reasons, the Court denies Shottenkirk's motion for leave to supplement his complaint, without prejudice to Shottenkirk's right to pursue his retaliation claim in a separate action. *See, e.g.*, *Singh*, 2016 WL 1039705, at \*10 ("In sum, the Court finds that Singh's proposed supplemental complaint includes distinct and separate claims. . . . Accordingly, the district judge should deny Singh's Motion for Leave to File a Supplemental Complaint, without prejudice to Singh pursuing the proposed new claims in a separate action.").

## B.    ODOC Defendants

The ODOC Defendants move for summary judgment on the ground that Shottenkirk failed to exhaust his available administrative remedies. (Defs.' Mot. Summ. J. at 2.) The Court agrees.

### 1.    Applicable Law

"The [Prison Litigation Reform Act ("PLRA")] requires prisoners to exhaust available administrative remedies prior to filing a . . . lawsuit challenging prison conditions." *Draper v. Rosario*, 836 F.3d 1072, 1078 (9th Cir. 2016) (citations omitted). In *Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) (en banc), the Ninth Circuit held that the defendant bears the burden of proving that an administrative remedy was available to the AIC and that he failed to exhaust such remedy, because non-exhaustion is an affirmative defense. *Id.* at 1172. "Once the defendant has carried that burden, the prisoner has the burden of production." *Id.* "That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case

that made the existing and generally available administrative remedies effectively unavailable to him." *Id.*

### 2.    Generally Available Administrative Remedies

The ODOC Defendants have met their initial burden of demonstrating that administrative remedies were generally available to Shottenkirk to grieve his complaints about his diet.

ODOC's grievance policy[3] encourages AICs to communicate with line staff verbally or in writing as their primary means of resolving disputes prior to filing a grievance, so that prison officials may address questions and complaints at the lowest local level. (Eynon Decl. ¶ 5.) However, if this does not bring resolution, the AIC may file a grievance if it complies with the rules and there is no other review process available. (*Id.*) Grievance forms are available on all housing units along with grievance instructions. (*Id.*)

An AIC may grieve: (a-b) the misapplication or lack of any administrative directive or operational procedure; (c) unprofessional behavior or action which may be directed toward an AIC by an employee or volunteer; (d) any oversight or error affecting an AIC; (e) a program failure unless it is a direct result of a misconduct report where the AIC is found in violation; (f) loss or destruction of property; (g) sexual contact, solicitation, or coercion between an employee or contractor and an AIC; and (h) sexual abuse of an AIC by another AIC if the victim does not consent, is coerced into such act by overt or implied threats of violence, or is unable to consent or refuse. (*Id. ¶ 6.*)

---

[3] Chapter 291, Division 109 of Oregon's administrative rules was amended effective October 18, 2019. *See* OFFICE OF THE SEC'Y OF STATE, *Permanent Administrative Order DOC 16-2019* (Oct. 17, 2019), available at https://secure.sos.state.or.us/oard/viewReceiptPDF.action?filingRsn=42510 (last visited Sept. 10, 2021). The amendment repealed OARs 291-109-0120 through 291-109-190 and replaced them with OARs 291-109-0205 through 291-109-0250, which employ the same three-step grievance appeal structure. The former rules are applicable to five out of Shottenkirk's six relevant grievances.

An AIC may appeal any grievance response to the functional unit manager. (*Id.* ¶ 7.) To appeal, the AIC must complete a grievance appeal form and file it with the grievance coordinator within fourteen calendar days from the date the grievance coordinator sent the grievance response to the AIC. (*Id.*) An AIC may appeal the functional unit manager's decision by completing a second grievance appeal form and filing it with the grievance coordinator within fourteen days of the date the first grievance appeal response was sent to the AIC. (*Id.* ¶ 8.) The Assistant Director's (or designee's) decision on an AIC's grievance appeal is final and not subject to further review. (*Id.*)

### 3.    Failure to Exhaust

The ODOC Defendants have met their initial burden of demonstrating that Shottenkirk failed to exhaust these available administrative remedies. The ODOC Defendants submitted evidence that Shottenkirk did not exhaust the grievance process for any of the six grievances relating to his diet:

- On August 17 and 19, 2019, Shottenkirk filed Grievance Nos. TRCI.2019.08.090 and TRCI.2019.08.094, respectively, alleging that he did not receive his soft bland diet. (*See id.* ¶¶ 10-19; Atts. 5-6.) However, Shottenkirk did not complete the grievance appeal process for either grievance. (*See id.* Atts. 5-6, indicating that ODOC officials received and responded to Shottenkirk's grievances and first-level grievance appeals, but Shottenkirk did not file a second-level grievance appeal for either grievance.)

- On September 9, 2019, Shottenkirk filed Grievance No. TRCI.2019.09.017, complaining that ODOC changed his prescribed diet and alleging the same incident date as Grievance No. TRCI.2019.08.094. (Eynon Decl. ¶ 23; Att. 8, at

2.) Shottenkirk did not file a first or second-level grievance appeal. (Eynon Decl. ¶ 25.)

- In Grievance Nos. TRCI.2019.08.171 and TRCI.2019.10.053, Shottenkirk again requested to be placed on a "soft bland diet." (*Id.* ¶¶ 20, 26; Atts. 7, 9.) However, Shottenkirk's grievances were returned to him for failure to comply with the rules, and Shottenkirk never corrected and resubmitted the grievances. (*Id.* ¶¶ 21-22, 27-28; Atts. 7, 9, indicating that the grievances were denied and returned to Shottenkirk on September 18 and October 16, 2019, respectively, because the grievances were duplicative of Shottenkirk's previous grievances, and appeared to grieve multiple staff.)

- On May 4, 2020, Shottenkirk filed Grievance No. TRCI.2020.05.014, again requesting to be placed on his prescribed diet, but he did not file a first or second-level grievance appeal for this grievance. (*Id.* ¶¶ 35-37; Att. 12.)

This undisputed evidence demonstrates that Shottenkirk failed to exhaust his claims relating to his diet. Accordingly, the Court finds that the ODOC Defendants have met their initial burden of demonstrating that Shottenkirk failed to exhaust his administrative remedies.

### 4.    Availability of Grievance Process

Shottenkirk does not identify any grievances or appeals missing from Defendants' filings, nor does he dispute the ODOC Defendants' assertion that he failed to exhaust the identified grievances. Rather, he argues that the grievance process was effectively unavailable to him, and therefore the Court turns to whether there was "something in [Shottenkirk's] particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172.

Shottenkirk argues that the grievance process was effectively unavailable to him because (1) the grievance rules do not permit an AIC to appeal a grievance that is returned for non-compliance with the rules; (2) his grievances constituted an emergency medical grievance under OAR 291-109-11(11), which is not subject to an exhaustion requirement; (3) TRCI Superintendent Troy Bowser ("Superintendent Bowser") directed Shottenkirk to stop pursuing the grievance process; and (4) ODOC improperly denied his grievances. (Pl.'s Opp'n to Defs.' Mot. Summ. J. ("Pl.'s Opp'n") at 1-3.)

### a.    Returned Grievances

Shottenkirk alleges that the grievance process was effectively unavailable to him because the grievance rules did not permit him to appeal denied grievances. (*See id.* at 1-2, stating that: (1) "defendants denied his grievance based on [] having filed multiple similar, but not identical, grievances," (2) defendants informed Shottenkirk that "he could not appeal further, because 'you cannot appeal a denied grievance,'" and (3) "[o]nce [he] had been so informed, the grievance process was no longer available and is therefore exhausted").

Shottenkirk is correct that under OAR 291-109-0160(5), he could not appeal a denied grievance returned to him for failure to follow the required procedures. (Eynon Decl. Att. 2, at 7.) Instead, "[i]f a grievance is returned to the inmate because it does not comply with [the grievance] rules, the inmate may elect to resubmit the grievance . . . within 14 calendar days from the date the grievance was sent back to the [AIC]." (*Id.* at 7-8.)

The record reflects that Shottenkirk did not resubmit the grievances that were denied for failure to follow procedural requirements. (*See* Eynon Decl. Atts. 7 at 1 & 9 at 1, noting that Grievance Nos. TRCI.2019.08.171 and TRCI 2019.10.053 were returned in part due to non-compliance with OAR 291-109-0140(5).) "[W]here a plaintiff fails to comply with deadlines or procedural rules governing grievances, so that his own failure causes remedies to become

PAGE 12 – OPINION AND ORDER

'unavailable,' the mistake is laid at his feet, and it is said that exhaustion was not 'proper.'" *Vega v. Bell*, No. 2:13-cv-00931-HU, 2015 WL 413796, at *3 (D. Or. Jan. 29, 2015) (citation omitted); *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006) ("[P]roper exhaustion of administrative remedies . . . means using all the steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).") (citation omitted).

In light of the fact that the grievance process ended as a result of Shottenkirk's failure to follow required procedures, Shottenkirk has failed to demonstrate that the grievance process was effectively unavailable to him. *See Alexander v. Peters*, No. 2:15-cv-02179-CL, 2019 WL 2529568, at *3 (D. Or. Apr. 12, 2019) (holding that ODOC's denial of the plaintiff's grievances did not render his administrative remedies effectively unavailable where the "grievances were denied in accordance with relevant ODOC rules, and [the] plaintiff was given opportunities to resubmit his grievances when appropriate"); *Heilburn v. Villanueva*, No. 3:14-cv-1706-SI, 2017 WL 2432152, at *5 (D. Or. June 5, 2017) ("Plaintiff could have, but did not pursue his first grievance on the issue [after it was returned to him]. Thus, Plaintiff failed to exhaust his administrative remedies[.]"); *Lovelady v. Beamer*, Case No. 2:14-CV-00769-KI, 2014 WL 7228870, at *3 (D. Or. Dec. 17, 2014) ("Prematurely ending the administrative process does not satisfy the PLRA exhaustion requirement, and does not demonstrate the unavailability of administrative relief.").

### b.    Emergency Medical Grievances

Shottenkirk also argues that his grievances were "emergency" grievances because he "faced a real and immediate risk of intestinal rupture resulting in emergency surgery or death," and that emergency grievances are not subject to the same exhaustion requirements as other grievances. (Pl.'s Opp'n at 2.)

An emergency grievance is "[a] grievance alleging actual or significant risk of immediate physical harm." (Eynon Decl. Att. 10, at 2.) The emergency grievance category was added to the amended OARs applicable to grievances filed after October 18, 2019, and therefore is relevant to only one of Shottenkirk's grievances—Grievance No. TRCI.2020.05.014. Shottenkirk did not allege an actual or significant risk of immediate physical harm in Grievance No. TRCI.2020.05.014. (*See* Eynon Decl. Att. 7, at 2 ("Being here is unlawful enough. Test us, vaccinate us, protect us [and] restore my diet. We cannot be told or asked to purchase food to survive from canteen. Give me my health snack back!").) Even if he had, Shottenkirk does not identify any provision in the new regulations providing that emergency grievances are exempt from an exhaustion requirement. (*See* Eynon Decl. Att. 10.) Thus, the emergency grievance regulations do not provide Shottenkirk a defense to the exhaustion requirement here.

### c.    Superintendent Bowser

Shottenkirk also argues that Superintendent Bowser suggested that he stop pursuing the grievance process and work directly with TRCI medical to resolve his complaints. (*See* Pl.'s Opp'n at 3.) The record contains no evidence to support Shottenkirk's assertion. Shottenkirk does not allege when Bowser allegedly made the statement, or in what form, and he does not allege that TRCI ever refused to accept his grievances based on Bowser's order. Shottenkirk's bare allegations, without more, are insufficient to withstand summary judgment. *See, e.g.*, *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.") (citation omitted).

### d.    Bad Faith

Shottenkirk also alleges that ODOC denied his grievances in bad faith because (1) OAR 291-109-140 (which ODOC relies upon in its denials of Grievance Nos. TRCI.2019.08.171 and TRCI.2019.10.053) does not exist; and (2) ODOC officials indicated that he would have to file

PAGE 14 – OPINION AND ORDER

separate grievances against each ODOC employee, but when he did, his grievances were denied based on more than four pending grievances at one time. (Pl.'s Opp'n at 2-3.)

Shottenkirk is correct that the current version of the administrative rules does not include OAR 291-109-140. However, as noted above, Chapter 291 of Oregon's administrative rules was amended effective October 18, 2019. The amendment repealed OARs 291-109-0120 through 291-109-190, and replaced them with OARs 291-109-0205 through 291-109-0250. (Eynon Decl. ¶¶ 4, 29; Atts. 2, 10.) The pre-amendment rules (including OAR 291-109-140) were in effect at the time Shottenkirk filed Grievance Nos. TRCI.2019.08.171 and TRCI.2019.10.053. (*See id.* Att. 2, 3-5, noting that Chapter 291, Division 109 of the administrative rules applied to grievances filed from November 19, 2014 through October 18, 2019; *id.* Att. 7, at 2; Att. 9, at 2, indicating that Shottenkirk filed Grievance Nos. TRCI.2019.08.171 and TRCI.2019.10.053 on August 27 and October 10, 2019, respectively.) OAR 291-109-140(5) provides that "[a]n inmate may not file more than one grievance regarding a single incident or issue unless more than one DOC or OCE employee, volunteer, or contractor is directly involved in the incident. A separate grievance must be filed for each individual." (*Id.* Att. 2, at 5.)

A review of ODOC's returned grievance forms for Grievance Nos. TRCI.2019.08.171 and TRCI.2019.10.053 indicates that both grievances were denied and returned to Shottenkirk because they were duplicative of Shottenkirk's previous grievances, and because Shottenkirk grieved multiple individuals in a single grievance form in violation of OAR 291-109-140(5). (*See id.* Att. 7, at 1; Att. 9, at 1, stating that Grievance Nos. TRCI.2019.08.171 and TRCI.2019.10.053 were denied because "[t]his grievance is a duplicate to TRGl-2019-08-094[,]" "[t]he issue was also discussed in TRCl-2019-08-090[,]" and "you appear to be grieving multiple

staff.") ODOC's denial was consistent with the rules in effect at the relevant time, and therefore ODOC's denial of Shottenkirk's grievances based on OAR 291-109-140 were not in bad faith.

Turning to Shottenkirk's argument that his grievances were improperly denied for exceeding four pending grievances, the record does not support his assertion. As previously discussed, two of Shottenkirk's grievances were denied and returned in part because he named multiple ODOC employees in a single grievance form, but Shottenkirk never attempted to resubmit separate grievances naming each individual. (*See id.* Atts. 5-6; 7 at 1; 8; 9 at 1; 12.) There is no record of any grievances returned on the ground that the grievance exceeded the maximum of four pending grievances.

For these reasons, Shottenkirk has not met his burden of demonstrating that the grievance process was effectively unavailable to him.

### 5.    Conclusion

Viewing the evidence in the light most favorable to Shottenkirk, and noting that Defendants bear the ultimate burden of proof to establish an exhaustion defense, the Court concludes that the ODOC Defendants are entitled to entry of judgment on their affirmative defense that Shottenkirk failed to exhaust available administrative remedies. *See Hash v. Lee*, 632 F. App'x 420, 420 (9th Cir. 2016) ("The district court properly granted summary judgment on [the plaintiff's] claims against [seventeen defendants] because [the plaintiff] did not properly exhaust his administrative remedies, and he did not show that administrative remedies were effectively unavailable to him.") (citations omitted).

### C.    Sims

Shottenkirk and Sims cross-move for summary judgment on Shottenkirk's Eighth Amendment claim. Shottenkirk alleges that Sims acted with deliberate indifference to his serious medical needs by discontinuing his low residue diet. (SAC at 12; Pl.'s Mot. Summ. J. at 6.) Sims

responds that her actions do not rise to the level of deliberate indifference. (Sims' Mot. Summ. J. at 5.) The Court agrees.

### 1.      Applicable Law

"Under 42 U.S.C. § 1983, to maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The Ninth Circuit's "test for deliberate indifference to [serious] medical need is two-pronged[.]" *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing *Jett*, 439 F.3d at 1096).

First, the plaintiff must show "the existence of a serious medical need." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle*, 429 U.S. at 104). A serious medical "need exists if failure to treat the injury or condition 'could result in further significant injury' or cause 'the unnecessary and wanton infliction of pain.'" *Id.* (quoting *Jett*, 439 F.3d at 1096).

"Second, the plaintiff must show the defendant's response to the need was deliberately indifferent." *Jett*, 439 F.3d at 1096 (citation omitted). "A prison official is deliberately indifferent under the subjective element of the test only if the official 'knows of and disregards an excessive risk to inmate health and safety.'" *Colwell*, 763 F.3d at 1066 (quoting *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004)). "This 'subjective approach' focuses only 'on what a defendant's mental attitude actually was.'" *Toguchi*, 391 F.3d at 1057 (quoting *Farmer v. Brennan*, 511 U.S. 825, 839 (1994)).

"Deliberate indifference is a high legal standard" and "[m]ere negligence in diagnosing or treating a medical condition . . . does not violate a prisoner's Eighth Amendment rights" and "even gross negligence is insufficient to establish a constitutional violation." *Toguchi*, 391 F.3d

at 1057-60 (citations omitted); *see also Wilhelm*, 680 F.3d at 1122 (explaining that "a plaintiff's showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference") (citation omitted).

### 2. Analysis

Shottenkirk alleges that Sims was deliberately indifferent to his serious medical needs by discontinuing his low residue diet. (SAC at 12; Pl.'s Mot. Summ. J. at 6.) Sims responds that she placed Shottenkirk on a regular diet to accommodate his request for specific food items listed in his oncologist-recommended diet, printed a copy of the prison's "low residue" diet to compare to the oncologist's recommended "soft bland" diet, and provided him with medication for his upset stomach. (Sims's Mot. Summ. J. at 5-6; Sims's Resp. to Pl.'s Cross Mot. at 4-5.)

Under circumstances not present here, the denial of a medically necessary diet may support a claim for deliberate indifference. *See, e.g.*, *Roberts v. Persona*, No. EDCV 17-1301 CJC (JC), 2019 WL 1776966, at *6 (C.D. Cal. Jan. 16, 2019) ("[F]ailure to provide an inmate with a medically-prescribed diet may be a sufficiently serious deprivation to state a viable Eighth Amendment claim."); *Pineida v. Lee*, No. 12-cv-01171-JST, 2014 WL 4802745, at *3 (N.D. Cal. Sept. 25, 2014) (granting injunctive relief for an AIC's deliberate indifference claim and finding that failing to provide the AIC with a low fiber diet violated his Eighth Amendment rights); *Masden v. Risenhoover*, No. C 09-5457 SBA (pr), 2013 WL 1345189, at *16-17 (N.D. Cal. Mar. 29, 2013) (denying summary judgment where the "[p]laintiff has raised a triable issue of material fact on whether [defendants] were deliberately indifferent to his dietary requirements").

Shottenkirk argues that he satisfies the objective prong of the deliberate indifference test because the foods included in both the low residue and regular diets do not meet his dietary needs, expose him to a risk of a GI rupture, and cause him to suffer diarrhea, cramping, nausea,

vomiting, bloating, and sharp pain. (SAC at 12; Pl.'s Opp'n at 3; Pl.'s Mot. Summ. J. at 1.) Sims does not dispute the objective prong, and the Court agrees that failing to provide Shottenkirk his medically prescribed diet poses a risk of objectively serious harm. *See, e.g., Pineida*, 2014 WL 4802745, at *2 (concluding that "a failure to provide a medically-recommended diet to an inmate constitutes a sufficiently serious deprivation to state an Eighth Amendment claim"); *see also Woulard v. Food Serv.,* 294 F. Supp. 2d 597, 603-04 (D. Del. Mar. 27, 2003) (finding that a medical diet prescribed to treat the plaintiff's Crohn's disease and diabetes was a "serious" medical need for purposes of the Eighth Amendment).

However, the record in this case does not support a conclusion that Sims acted with deliberate indifference to Shottenkirk's serious medical needs. It is undisputed that in April 2020, Sims discontinued Shottenkirk's low residue diet and placed him on a regular diet. (Sims Decl. ¶ 3.) Shottenkirk believes that Sims made the change so that he would eat more vegetables. (SAC at 12.) Sims represents she changed Shottenkirk's diet to "accommodate more meal choices" in response to his request for specific food items from his oncologist's food list. (Sims Decl. ¶ 3.)

On April 20, 2020, Shottenkirk sent a kyte to Sims requesting to be returned to his prescribed soft bland diet, and stating that "since I've been off my diet, I'm throwing up, my stomach is all upset, and I have diarea [sic] again." (Decl. of Scott G. O'Donnell ("O'Donnell Decl.") Ex. 2.) Three days later, Sims responded to Shottenkirk's kyte, explaining that the "low-residue diet also functions as [a] bland diet[,]" and that Shottenkirk's prescribed diet "includes many of the diet food items included in [O]DOC's low-residue special diet." (*Id.* Ex. 3.) In her response, the authenticity of which Shottenkirk does not dispute, Sims (1) attached copies of Shottenkirk's prescribed diet and ODOC's low residue diet to show the similarity of the two

diets, (2) explained that she discontinued Shottenkirk's low residue diet so that he "may specifically design/choose food items from the regular diet[,]" (3) suggested Shottenkirk purchase any additional items not on his medically-prescribed diet from the canteen at the prison, and (4) prescribed Shottenkirk Loperamide to treat his digestive issues. (*Id.*; Sims Decl. ¶ 4.)

Even viewing this evidence in the light most favorable to Shottenkirk, the record demonstrates that Sims promptly responded to Shottenkirk's dietary concerns, attempted to accommodate his requests for specific food items, and provided treatment for Shottenkirk's digestive issues. (O'Donnell Decl. Exs. 2-3.) To establish deliberate indifference, Shottenkirk must set forth sufficient facts suggesting "that the course of treatment" Sims "chose was medically unacceptable under the circumstances" and was chosen "in conscious disregard of an excessive risk" to Shottenkirk's health. *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (citation omitted). Here, it is undisputed that Sims allowed Shottenkirk to choose foods recommended by his oncologist from the regular diet menu, and that she did so in response to his concerns about the types of food he had been receiving. Shottenkirk does not offer any evidence to demonstrate that Sims's decision was medically unacceptable, nor that she disregarded an excessive risk to Shottenkirk's health by offering him control over a less restrictive menu to select the specific foods listed on his prescribed diet. Although Shottenkirk disagreed with Sims's approach, there is no evidence to suggest that Sims acted with deliberate indifference. *Cf. Moser v. Stewart*, 137 F. App'x 55, 55 (9th Cir. 2005) ("Summary judgment was proper on [the plaintiff's] claim that the low-residue diet prison doctors prescribed was nutritionally inadequate as a difference of opinion between a prisoner and the prison doctor does not support a claim of deliberate indifference.").

///

Even if Sims made a mistake by switching Shottenkirk to the regular menu, mere negligence is insufficient to establish an Eighth Amendment violation. *See Farmer*, 511 U.S. at 844 (stating that prison officials are not deliberately indifferent if they "actually knew of a substantial risk to inmate health or safety" but "responded reasonably to the risk, even if the harm ultimately was not averted"); *Moser*, 137 F. App'x at 55 ("Summary judgment was proper on [the plaintiff's] claim that he was occasionally served meals that did not comply with his medically-prescribed diet" because "gross negligence is insufficient to establish deliberate indifference").

Based on the record before the Court, no reasonable juror could find that Sims acted with deliberate indifference to Shottenkirk's serious medical needs. Accordingly, Sims is entitled to summary judgment on Shottenkirk's Eighth Amendment claim.

## CONCLUSION

For the reasons stated, the Court DENIES Shottenkirk's motion for leave to supplement his complaint (ECF No. 41), GRANTS Sims's motion for summary judgment (ECF No. 27), DENIES Shottenkirk's cross-motion for summary judgment (ECF No. 31), and GRANTS the ODOC Defendants' motion for summary judgment (ECF No. 32).

DATED this 10th day of September, 2021.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge